(Slip Opinion) OCTOBER TERM, 2018 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MERCK SHARP & DOHME CORP. *v.* ALBRECHT ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 17–290. Argued January 7, 2019—Decided May 20, 2019

Petitioner Merck Sharp & Dohme Corp. manufactures Fosamax, a drug that treats and prevents osteoporosis in postmenopausal women. However, the mechanism through which Fosamax treats and prevents osteoporosis may increase the risk that patients will suffer "atypical femoral fractures," that is, a rare type of complete, low-energy fracture that affects the thigh bone. When the Food and Drug Administration first approved of the manufacture and sale of Fosamax in 1995, the Fosamax label did not warn of the then-speculative risk of atypical femoral fractures associated with the drug. But stronger evidence connecting Fosamax to atypical femoral fractures developed after 1995. And the FDA ultimately ordered Merck to add a warning about atypical femoral fractures to the Fosamax label in 2011.

Respondents are more than 500 individuals who took Fosamax and suffered atypical femoral fractures between 1999 and 2010. Respondents sued Merck seeking tort damages on the ground that state law imposed upon Merck a legal duty to warn respondents and their doctors about the risk of atypical femoral fractures associated with using Fosamax. Merck, in defense, argued that respondents' state-law failure-to-warn claims should be dismissed as pre-empted by federal law. Merck conceded that the FDA regulations would have permitted Merck to try to change the label to add a warning before 2010, but Merck asserted that the FDA would have rejected that attempt. In particular, Merck claimed that the FDA's rejection of Merck's 2008 attempt to warn of a risk of "stress fractures" showed that the FDA would also have rejected any attempt by Merck to warn of the risk of atypical femoral fractures associated with the drug.

The District Court agreed with Merck's pre-emption argument and

granted summary judgment to Merck, but the Third Circuit vacated and remanded. The Court of Appeals recognized that its pre-emption analysis was controlled by this Court's decision in *Wyeth* v. *Levine*, 555 U. S. 555, which held that a state-law failure-to-warn claim is pre-empted where there is "clear evidence" that the FDA would not have approved a change to the label. The Court of Appeals, however, suggested that the "clear evidence" standard had led to varying lower court applications and that it would be helpful for this Court to "clarif[y] or buil[d] out the doctrine." 852 F. 3d 268, 284.

*Held*:

1. "Clear evidence" is evidence that shows the court that the drug manufacturer fully informed the FDA of the justifications for the warning required by state law and that the FDA, in turn, informed the drug manufacturer that the FDA would not approve a change to the drug's label to include that warning. Pp. 9–15.

(a) The *Wyeth* Court undertook a careful review of the history of federal regulation of drugs and drug labeling and found both a reluctance by Congress to displace state laws that would penalize drug manufacturers for failing to warn consumers of the risks associated with their drugs and an insistence by Congress that drug manufacturers bear the responsibility for the content of their drug labels. Accordingly, this Court held in *Wyeth* that "absent clear evidence that the FDA would not have approved a change" to the label, the Court "will not conclude that it was impossible . . . to comply with both federal and state requirements." 555 U. S., at 571. Applying that rule to the facts of that case, the Court said that Wyeth's evidence of pre-emption fell short for two reasons. First, the record did not show that Wyeth "supplied the FDA with an evaluation or analysis concerning the specific dangers" that would have merited the warning. *Id.*, at 572–573. And second, the record did not show that Wyeth "attempted to give the kind of warning required by [state law] but was prohibited from doing so by the FDA." *Ibid.*, and n. 5. Pp. 10–13.

(b) Thus, in a case like *Wyeth*, showing that federal law prohibited the drug manufacturer from adding a warning that would satisfy state law requires the drug manufacturer to show that it fully informed the FDA of the justifications for the warning required by state law and that the FDA, in turn, informed the drug manufacturer that the FDA would not approve changing the drug's label to include that warning. These conclusions flow from this Court's precedents on impossibility pre-emption and the statutory and regulatory scheme that the Court reviewed in *Wyeth*. See 555 U. S., at 578. In particular, this Court has refused to find clear evidence of impossibility where the laws of one sovereign permit an activity that the laws of the other sovereign restrict or even prohibit. And as explained in *Wyeth*, FDA

regulations permit drug manufacturers to change a label to "reflect newly acquired information" if the changes "add or strengthen a . . . warning" for which there is "evidence of a causal association." 21 CFR §314.70(c)(6)(iii)(A). Pp. 13–14.

(c) The only agency actions that can determine the answer to the pre-emption question are agency actions taken pursuant to the FDA's congressionally delegated authority. The Supremacy Clause grants "supreme" status only to the "the *Laws* of the United States." U. S. Const., Art. VI, cl. 2. And pre-emption takes place " 'only when and if [the agency] is acting within the scope of its congressionally delegated authority.' " *New York* v. *FERC*, 535 U. S. 1, 18 (some alterations omitted). P 15.

2. The question of agency disapproval is primarily one of law for a judge to decide. The question often involves the use of legal skills to determine whether agency disapproval fits facts that are not in dispute. Moreover, judges, rather than lay juries, are better equipped to evaluate the nature and scope of an agency's determination, and are better suited to understand and to interpret agency decisions in light of the governing statutory and regulatory context. While contested brute facts will sometimes prove relevant to a court's legal determination about the meaning and effect of an agency decision, such factual questions are subsumed within an already tightly circumscribed legal analysis and do not warrant submission alone or together with the larger pre-emption question to a jury. Pp. 15–17.

852 F. 3d 268, vacated and remanded.

BREYER, J., delivered the opinion of the Court, in which THOMAS, GINSBURG, SOTOMAYOR, KAGAN, and GORSUCH, JJ., joined. THOMAS, J., filed a concurring opinion. ALITO, J., filed an opinion concurring in the judgment, in which ROBERTS, C. J., and KAVANAUGH, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–290

MERCK SHARP & DOHME CORP., PETITIONER *v.*
DORIS ALBRECHT, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[May 20, 2019]

JUSTICE BREYER delivered the opinion of the Court.

When Congress enacted the Federal Food, Drug, and Cosmetic Act, ch. 675, 52 Stat. 1040, as amended, 21 U. S. C. §301 *et seq.*, it charged the Food and Drug Administration with ensuring that prescription drugs are "safe for use under the conditions prescribed, recommended, or suggested" in the drug's "labeling." §355(d). When the FDA exercises this authority, it makes careful judgments about what warnings should appear on a drug's label for the safety of consumers.

For that reason, we have previously held that "clear evidence" that the FDA would not have approved a change to the drug's label pre-empts a claim, grounded in state law, that a drug manufacturer failed to warn consumers of the change-related risks associated with using the drug. See *Wyeth* v. *Levine*, 555 U. S. 555, 571 (2009). We here determine that this question of pre-emption is one for a judge to decide, not a jury. We also hold that "clear evidence" is evidence that shows the court that the drug manufacturer fully informed the FDA of the justifications for the warning required by state law and that the FDA, in

turn, informed the drug manufacturer that the FDA would not approve a change to the drug's label to include that warning.

I

The central issue in this case concerns federal pre-emption, which as relevant here, takes place when it is "'impossible for a private party to comply with both state and federal requirements.'" *Mutual Pharmaceutical Co.* v. *Bartlett*, 570 U. S. 472, 480 (2013). See also U. S. Const., Art. VI, cl. 2. The state law that we consider is state common law or state statutes that require drug manufacturers to warn drug consumers of the risks associated with drugs. The federal law that we consider is the statutory and regulatory scheme through which the FDA regulates the information that appears on brand-name prescription drug labels. The alleged conflict between state and federal law in this case has to do with a drug that was manufactured by petitioner Merck Sharp & Dohme and was administered to respondents without a warning of certain associated risks.

A

The FDA regulates the safety information that appears on the labels of prescription drugs that are marketed in the United States. 21 U. S. C. §355(b)(1)(F); 21 CFR §201.57(a) (2018). Although we commonly understand a drug's "label" to refer to the sticker affixed to a prescription bottle, in this context the term refers more broadly to the written material that is sent to the physician who prescribes the drug and the written material that comes with the prescription bottle when the drug is handed to the patient at the pharmacy. 21 U. S. C. §321(m). These (often lengthy) package inserts contain detailed information about the drug's medical uses and health risks. §355(b)(1)(F); 21 CFR §201.57(a).

FDA regulations set out requirements for the content, the format, and the order of the safety information on the drug label. §201.57(c). Those regulations require drug labels to include, among other things: (1) prominent "boxed" warnings about risks that may lead to death or serious injury; (2) contraindications describing any situation in which the drug should not be used because the risk of use outweighs any therapeutic benefit; (3) warnings and precautions about other potential safety hazards; and (4) any adverse reactions for which there is some basis to believe a causal relationship exists between the drug and the occurrence of the adverse event. *Ibid.*

As those requirements make clear, the category in which a particular risk appears on a drug label is an indicator of the likelihood and severity of the risk. The hierarchy of label information is designed to "prevent overwarning" so that less important information does not "overshadow" more important information. 73 Fed. Reg. 49605–49606 (2008). It is also designed to exclude "[e]xaggeration of risk, or inclusion of speculative or hypothetical risks," that "could discourage appropriate use of a beneficial drug." *Id.*, at 2851.

Prospective drug manufacturers work with the FDA to develop an appropriate label when they apply for FDA approval of a new drug. 21 U. S. C. §§355(a), 355(b), 355(d)(7); 21 CFR §314.125(b)(6). But FDA regulations also acknowledge that information about drug safety may change over time, and that new information may require changes to the drug label. §§314.80(c), 314.81(b)(2)(i). Drug manufacturers generally seek advance permission from the FDA to make substantive changes to their drug labels. However, an FDA regulation called the "changes being effected" or "CBE" regulation permits drug manufacturers to change a label without prior FDA approval if the change is designed to "add or strengthen a . . . warning" where there is "newly acquired information" about the

"evidence of a causal association" between the drug and a risk of harm.  21 CFR §314.70(c)(6)(iii)(A).

### B

Petitioner Merck Sharp & Dohme manufactures Fosamax, a drug that treats and prevents osteoporosis in postmenopausal women.  App. 192; *In re Fosamax* (*Alendronate Sodium*) *Products Liability Litigation*, 852 F. 3d 268, 271, 274–275 (CA3 2017).  Fosamax belongs to a class of drugs called "bisphosphonates."  Fosamax and other bisphosphonates work by affecting the "bone remodeling process," that is, the process through which bones are continuously broken down and built back up again.  App. 102, 111.  For some postmenopausal women, the two parts of the bone remodeling process fall out of sync; the body removes old bone cells faster than it can replace them. That imbalance can lead to osteoporosis, a disease that is characterized by low bone mass and an increased risk of bone fractures.  Fosamax (like other bisphosphonates) slows the breakdown of old bone cells and thereby helps postmenopausal women avoid osteoporotic fractures.  *Id.,* at 102.

However, the mechanism through which Fosamax decreases the risk of osteoporotic fractures may increase the risk of a different type of fracture.  *Id.*, at 400–444, 661–663.  That is because all bones—healthy and osteoporotic alike—sometimes develop microscopic cracks that are not due to any trauma, but are instead caused by the mechanical stress of everyday activity.  *Id.,* at 102.  Those so-called "stress fractures" ordinarily heal on their own through the bone remodeling process.  But, by slowing the breakdown of old bone cells, Fosamax and other bisphosphonates may cause stress fractures to progress to complete breaks that cause great pain and require surgical intervention to repair.  *Id.,* at 106–109, 139, 144–145. When that rare type of complete, low-energy fracture

affects the thigh bone, it is called an "atypical femoral fracture." *Id.,* at 101.

The Fosamax label that the FDA approved in 1995 did not warn of the risk of atypical femoral fractures. 852 F. 3d, at 274–275. At that time, Merck's scientists were aware of at least a theoretical risk of those fractures. Indeed, as far back as 1990 and 1991, when Fosamax was undergoing preapproval clinical trials, Merck scientists expressed concern in internal discussions that Fosamax could inhibit bone remodeling to such a "'profound'" degree that "inadequate repair may take place" and "'microfractures would not heal.'" App. 111–113. When Merck applied to the FDA for approval of Fosamax, Merck brought those theoretical considerations to the FDA's attention. 852 F. 3d, at 274–275. But, perhaps because the concerns were only theoretical, the FDA approved Fosamax's label without requiring any mention of this risk. *Ibid.*

Evidence connecting Fosamax to atypical femoral fractures developed after 1995. Merck began receiving adverse event reports from the medical community indicating that long-term Fosamax users were suffering atypical femoral fractures. App. 122–125. For example, Merck received a report from a doctor who said that hospital staff had begun calling atypical femoral fractures the "'Fosamax Fracture'" because "'100% of patients in his practice who have experienced femoral fractures (without being hit by a taxicab), were taking Fosamax . . . for over 5 years.'" *Id.,* at 126. Merck performed a statistical analysis of Fosamax adverse event reports, concluding that these reports revealed a statistically significant incidence of femur fractures. 3 App. in No. 14–1900 (CA3), pp. A1272–A1273, A1443. And about the same time, Merck began to see numerous scholarly articles and case studies documenting possible connections between long-term Fosamax use and atypical femoral fractures. App. 106–110, 116–

122.

In 2008, Merck applied to the FDA for preapproval to change Fosamax's label to add language to both the "Adverse Reaction[s]" and the "Precaution[s]" sections of the label. *Id.,* at 670. In particular, Merck proposed adding a reference to "'low-energy femoral shaft fracture'" in the Adverse Reactions section, and cross-referencing a longer discussion in the Precautions section that focused on the risk of stress fractures associated with Fosamax. *Id.,* at 728. The FDA approved the addition to the Adverse Reactions section, but rejected Merck's proposal to warn of a risk of "stress fractures." *Id.,* at 511–512. The FDA explained that Merck's "justification" for the proposed change to the Precautions section was "inadequate," because "[i]dentification of 'stress fractures' may not be clearly related to the atypical subtrochanteric fractures that have been reported in the literature." *Id.,* at 511. The FDA invited Merck to "resubmit" its application and to "fully address all the deficiencies listed." *Id.*, at 512; see 21 CFR §314.110(b). But Merck instead withdrew its application and decided to make the changes to the Adverse Reactions section through the CBE process. App. 654–660. Merck made no changes to the Precautions section at issue here. *Id.,* at 274.

A warning about "atypical femoral fractures" did not appear on the Fosamax label until 2011, when the FDA ordered that change based on its own analyses. *Id.,* at 246–252, 526–534. Merck was initially resistant to the change, proposing revised language that, once again, referred to the risk of "stress fractures." *Id.,* at 629–634. But the FDA, once again, rejected that language. And this time, the FDA explained that "the term 'stress fracture' was considered and was not accepted" because, "for most practitioners, the term 'stress fracture' represents a minor fracture and this would contradict the seriousness of the atypical femoral fractures associated with bisphosphonate

use." *Id.,* at 566. In January 2011, Merck and the FDA ultimately agreed upon adding a three-paragraph discussion of atypical femoral fractures to the Warnings and Precautions section of the Fosamax label. *Id.,* at 223–224. The label now refers to the fractures five times as "atypical" without using the term "stress fracture." *Ibid.*

C

The respondents here are more than 500 individuals who took Fosamax and who suffered atypical femoral fractures between 1999 and 2010. Brief for Respondents 7. Respondents, invoking federal diversity jurisdiction, filed separate actions seeking tort damages on the ground that, during the relevant period, state law imposed upon Merck a legal duty to warn them and their doctors about the risk of atypical femoral fractures associated with using Fosamax. *Id.*, at 1. One respondent, for example, filed a complaint alleging that she took Fosamax for roughly 10 years and suffered an atypical femoral fracture. One day in 2009, when the respondent was 70 years old, she turned to unlock the front door of her house, heard a popping sound, and suddenly felt her left leg give out beneath her. She needed surgery, in which doctors repaired her leg with a rod and screws. She explained she would not have used Fosamax for so many years if she had known that she might suffer an atypical femoral fracture as a result. See *id.,* at 18–19.

Merck, in defense, argued that respondents' state-law failure-to-warn claims should be dismissed as pre-empted by federal law. Both Merck and the FDA have long been aware that Fosamax could theoretically increase the risk of atypical femoral fractures. But for some period of time between 1995 (when the FDA first approved a drug label for Fosamax) and 2010 (when the FDA decided to require Merck to add a warning about atypical femoral fractures to Fosamax's label), both Merck and the FDA were unsure

whether the developing evidence of a causal link between Fosamax and atypical femoral fractures was strong enough to require adding a warning to the Fosamax drug label. Merck conceded that the FDA's CBE regulation would have permitted Merck to try to change the label to add a warning before 2010, but Merck asserted that the FDA would have rejected that attempt. In particular, Merck pointed to the FDA's rejection of Merck's 2008 attempt to amend the Fosamax label to warn of the risk of "stress fractures" associated with Fosamax. On that basis, Merck claimed that federal law prevented Merck from complying with any state-law duty to warn the respondents of the risk of atypical femoral fractures associated with Fosamax.

The District Court agreed with Merck's pre-emption argument and granted summary judgment to Merck, *In re Fosamax* (*Alendronate Sodium*): *Products Liability Litigation*, 2014 WL 1266994, *17 (D NJ, Mar. 22, 2017), but the Court of Appeals vacated and remanded, 852 F. 3d, at 302. The Court of Appeals concluded that its pre-emption analysis was controlled by this Court's decision in *Wyeth*. *Ibid.* The Court of Appeals understood that case as making clear that a failure-to-warn claim grounded in state law is pre-empted where there is "'clear evidence that the FDA would not have approved a change to the . . . label.'" *Id.,* at 280 (quoting *Wyeth*, 555 U. S., at 571). The Court of Appeals, however, suggested that this statement had led to varying lower court applications and that it would be helpful for this Court to "clarif[y] or buil[d] out the doctrine." 852 F. 3d, at 284.

In attempting to do so itself, the Court of Appeals held that "the Supreme Court intended to announce a standard of proof when it used the term 'clear evidence' in *Wyeth*." *Ibid.* That is, the Court of Appeals believed that "[t]he term 'clear evidence' . . . does not refer directly to the *type* of facts that a manufacturer must show, or to the circum-

stances in which preemption will be appropriate." *Id.*, at 285. "Rather, it specifies how *difficult* it will be for the manufacturer to convince the factfinder that the FDA would have rejected a proposed label change." *Ibid.* And in the Court of Appeals' view, "for a defendant to establish a preemption defense under *Wyeth*, the factfinder must conclude that it is highly probable that the FDA would not have approved a change to the drug's label." *Id.,* at 286. Moreover and importantly, the Court of Appeals also held that "whether the FDA would have rejected a proposed label change is a question of fact that must be answered by a jury." *Ibid.*

Merck filed a petition for a writ of certiorari. Merck's petition asked the Court to decide whether Merck's case and others like it "must . . . go to a jury" to determine whether the FDA, in effect, has disapproved a state-law-required labeling change. In light of differences and uncertainties among the courts of appeals and state supreme courts in respect to the application of *Wyeth*, we granted certiorari. See, *e.g., Mason* v. *SmithKline Beecham Corp.*, 596 F. 3d 387, 391 (CA7 2010) ("The Supreme Court . . . did not clarify what constitutes 'clear evidence'"); *Reckis* v. *Johnson & Johnson*, 471 Mass. 272, 286, 28 N. E. 3d 445, 457 (2015) ("*Wyeth* did not define 'clear evidence' . . . " (some internal quotation marks omitted)).

II

We stated in *Wyeth* v. *Levine* that state law failure-to-warn claims are pre-empted by the Federal Food, Drug, and Cosmetic Act and related labeling regulations when there is "clear evidence" that the FDA would not have approved the warning that state law requires. 555 U. S., at 571. We here decide that a judge, not the jury, must decide the pre-emption question. And we elaborate *Wyeth*'s requirements along the way.

### A

We begin by describing *Wyeth*. In that case, the plaintiff developed gangrene after a physician's assistant injected her with Phenergan, an antinausea drug. The plaintiff brought a state-law failure-to-warn claim against Wyeth, the drug's manufacturer, for failing to provide an adequate warning about the risks that accompany various methods of administering the drug. In particular, the plaintiff claimed that directly injecting Phenergan into a patient's vein (the "IV-push" method of administration) creates a significant risk of catastrophic consequences. And those consequences could be avoided by introducing the drug into a saline solution that slowly descends into a patient's vein (the "IV-drip" method of administration). A jury concluded that Wyeth's warning label was inadequate, and that the label's inadequacy caused the plaintiff's injury. On appeal, Wyeth argued that the plaintiff's state-law failure-to-warn claims were pre-empted because it was impossible for Wyeth to comply with both state law duties and federal labeling obligations. The Vermont Supreme Court rejected Wyeth's pre-emption claim. *Id.,* at 563.

We too considered Wyeth's pre-emption argument, and we too rejected it. In rejecting Wyeth's argument, we undertook a careful review of the history of federal regulation of drugs and drug labeling. *Id.,* at 566–568. In doing so, we "assum[ed] that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.,* at 565 (internal quotation marks omitted). And we found nothing within that history to indicate that the FDA's power to approve or to disapprove labeling changes, by itself, pre-empts state law.

Rather, we concluded that Congress enacted the FDCA "to bolster consumer protection against harmful products;" that Congress provided no "*federal* remedy for consumers harmed by unsafe or ineffective drugs"; that Congress was

"awar[e] of the prevalence of state tort litigation;" and that, whether Congress' general purpose was to protect consumers, to provide safety-related incentives to manufacturers, or both, language, history, and purpose all indicate that "Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness." *Id.,* at 574–575 (emphasis added). See also *id.,* at 574 ("If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history").

We also observed that "through many amendments to the FDCA and to FDA regulations, it has remained a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times." *Id.,* at 570–571. A drug manufacturer "is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market." *Id.,* at 571. Thus, when the risks of a particular drug become apparent, the manufacturer has "a duty to provide a warning that adequately describe[s] that risk." *Ibid.* "Indeed," we noted, "prior to 2007, the FDA lacked the authority to order manufacturers to revise their labels." *Ibid.* And even when "Congress granted the FDA this authority," in the 2007 Amendments to the FDCA, Congress simultaneously "reaffirmed the manufacturer's obligations and referred specifically to the CBE regulation, which both reflects the manufacturer's ultimate responsibility for its label and provides a mechanism for adding safety information to the label prior to FDA approval." *Ibid.*

In light of Congress' reluctance to displace state laws that would penalize drug manufacturers for failing to warn consumers of the risks associated with their drugs, and Congress' insistence on requiring drug manufacturers to bear the responsibility for the content of their drug

labels, we were unpersuaded by Wyeth's pre-emption argument. In Wyeth's case, we concluded, "when the risk of gangrene from IV-push injection of Phenergan became apparent, Wyeth had a duty" under state law "to provide a warning that adequately described that risk, and the CBE regulation permitted it to provide such a warning before receiving the FDA's approval." *Ibid.*

At the same time, and more directly relevant here, we pointed out that "the FDA retains authority to reject labeling changes made pursuant to the CBE regulation in its review of the manufacturer's supplemental application, just as it retains such authority in reviewing all supplemental applications." *Ibid.* We then said that, nonetheless, "*absent clear evidence that the FDA would not have approved a change* to Phenergan's label, we will not conclude that it was impossible for Wyeth to comply with both federal and state requirements." *Ibid.* (emphasis added).

We reviewed the record and concluded that "Wyeth has offered no such evidence." *Id.*, at 572. We said that Wyeth's evidence of pre-emption fell short for two reasons. First, the record did not show that Wyeth "supplied the FDA with an evaluation or analysis concerning the specific dangers" that would have merited the warning. *Id.*, at 572–573. We could find "no evidence in this record that either the FDA or the manufacturer gave more than passing attention to the issue of IV-push versus IV-drip administration"—the matter at issue in the case. *Id.*, at 572 (internal quotation marks omitted). Second, the record did not show that Wyeth "attempted to give the kind of warning required by [state law] but was prohibited from doing so by the FDA." *Ibid.*, and n. 5. The "FDA had not made an affirmative decision to preserve" the warning as it was or "to prohibit Wyeth from strengthening its warning." *Id.*, at 572. For those reasons, we could not "credit Wyeth's contention that the FDA would have prevented it from adding a stronger warning about the IV-push method

of intravenous administration." And we could not conclude that "it was impossible for Wyeth to comply with both federal and state requirements." *Id.*, at 573. We acknowledged that meeting the standard we set forth would be difficult, but, we said, "[i]mpossibility preemption is a demanding defense." *Ibid.*

B

The underlying question for this type of impossibility pre-emption defense is whether federal law (including appropriate FDA actions) prohibited the drug manufacturer from adding any and all warnings to the drug label that would satisfy state law. And, of course, in order to succeed with that defense the manufacturer must show that the answer to this question is yes. But in *Wyeth*, we confronted that question in the context of a particular set of circumstances. Accordingly, for purposes of this case, we assume—but do not decide—that, as was true of the warning at issue in *Wyeth*, there is sufficient evidence to find that Merck violated state law by failing to add a warning about atypical femoral fractures to the Fosamax label. In a case like *Wyeth*, showing that federal law prohibited the drug manufacturer from adding a warning that would satisfy state law requires the drug manufacturer to show that it fully informed the FDA of the justifications for the warning required by state law and that the FDA, in turn, informed the drug manufacturer that the FDA would not approve changing the drug's label to include that warning.

These conclusions flow from our precedents on impossibility pre-emption and the statutory and regulatory scheme that we reviewed in *Wyeth*. See 555 U. S., at 578. In particular, "it has long been settled that state laws that conflict with federal law are without effect." *Mutual Pharmaceutical Co.*, 570 U. S., at 480. But as we have cautioned many times before, the "possibility of impossibil-

ity [is] not enough." *PLIVA, Inc.* v. *Mensing*, 564 U. S. 604, 625, n. 8 (2011) (internal quotation marks omitted). Consequently, we have refused to find clear evidence of such impossibility where the laws of one sovereign permit an activity that the laws of the other sovereign restrict or even prohibit. See, *e.g., Barnett Bank of Marion Cty., N. A.* v. *Nelson*, 517 U. S. 25, 31 (1996); *Michigan Canners & Freezers Assn., Inc.* v. *Agricultural Marketing and Bargaining Bd.*, 467 U. S. 461, 478, and n. 21 (1984).

And, as we explained in *Wyeth*, 555 U. S., at 571–573, federal law—the FDA's CBE regulation—permits drug manufacturers to change a label to "reflect newly acquired information" if the changes "add or strengthen a . . . warning" for which there is "evidence of a causal association," without prior approval from the FDA. 21 CFR §314.70(c)(6)(iii)(A). Of course, the FDA reviews CBE submissions and can reject label changes even after the manufacturer has made them. See §§314.70(c)(6), (7). And manufacturers cannot propose a change that is not based on reasonable evidence. §314.70(c)(6)(iii)(A). But in the interim, the CBE regulation permits changes, so a drug manufacturer will not ordinarily be able to show that there is an actual conflict between state and federal law such that it was impossible to comply with both.

We do not further define *Wyeth*'s use of the words "clear evidence" in terms of evidentiary standards, such as "preponderance of the evidence" or "clear and convincing evidence" and so forth, because, as we shall discuss, *infra*, at 15–17*,* courts should treat the critical question not as a matter of fact for a jury but as a matter of law for the judge to decide. And where that is so, the judge must simply ask himself or herself whether the relevant federal and state laws "irreconcilably conflic[t]." *Rice* v. *Norman Williams Co.*, 458 U. S. 654, 659 (1982); see *ibid.* ("The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute").

We do note, however, that the only agency actions that can determine the answer to the pre-emption question, of course, are agency actions taken pursuant to the FDA's congressionally delegated authority. The Supremacy Clause grants "supreme" status only to the "the *Laws* of the United States." U. S. Const., Art. VI, cl. 2. And pre-emption takes place "'only when and if [the agency] is acting within the scope of its congressionally delegated authority, . . . for an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it.'" *New York* v. *FERC*, 535 U. S. 1, 18 (2002) (some alterations omitted). Federal law permits the FDA to communicate its disapproval of a warning by means of notice-and-comment rulemaking setting forth labeling standards, see, *e.g.*, 21 U. S. C. §355(d); 21 CFR §§201.57, 314.105; by formally rejecting a warning label that would have been adequate under state law, see, *e.g.,* 21 CFR §§314.110(a), 314.125(b)(6); or with other agency action carrying the force of law, cf., *e.g.,* 21 U. S. C. §355(o)(4)(A). The question of disapproval "method" is not now before us. And we make only the obvious point that, whatever the means the FDA uses to exercise its authority, those means must lie within the scope of the authority Congress has lawfully delegated.

## III

We turn now to what is the determinative question before us: Is the question of agency disapproval primarily one of fact, normally for juries to decide, or is it a question of law, normally for a judge to decide without a jury?

The complexity of the preceding discussion of the law helps to illustrate why we answer this question by concluding that the question is a legal one for the judge, not a jury. The question often involves the use of legal skills to determine whether agency disapproval fits facts that are

not in dispute. Moreover, judges, rather than lay juries, are better equipped to evaluate the nature and scope of an agency's determination. Judges are experienced in "[t]he construction of written instruments," such as those normally produced by a federal agency to memorialize its considered judgments. *Markman* v. *Westview Instruments, Inc.,* 517 U. S. 370, 388 (1996). And judges are better suited than are juries to understand and to interpret agency decisions in light of the governing statutory and regulatory context. Cf. 5 U. S. C. §706 (specifying that a "reviewing court," not a jury, "shall . . . determine the meaning or applicability of the terms of an agency action"); see also H. R. Rep. No. 1980, 79th Cong., 2d Sess., 44 (1946) (noting longstanding view that "questions respecting the . . . terms of any agency action" and its "application" are "questions of law"). To understand the question as a legal question for judges makes sense given the fact that judges are normally familiar with principles of administrative law. Doing so should produce greater uniformity among courts; and greater uniformity is normally a virtue when a question requires a determination concerning the scope and effect of federal agency action. Cf. *Markman,* 517 U. S., at 390–391.

We understand that sometimes contested brute facts will prove relevant to a court's legal determination about the meaning and effect of an agency decision. For example, if the FDA rejected a drug manufacturer's supplemental application to change a drug label on the ground that the information supporting the application was insufficient to warrant a labeling change, the meaning and scope of that decision might depend on what information the FDA had before it. Yet in litigation between a drug consumer and a drug manufacturer (which will ordinarily lack an official administrative record for an FDA decision), the litigants may dispute whether the drug manufacturer submitted all material information to the FDA.

But we consider these factual questions to be subsumed within an already tightly circumscribed legal analysis. And we do not believe that they warrant submission alone or together with the larger pre-emption question to a jury. Rather, in those contexts where we have determined that the question is "for the judge and not the jury," we have also held that "courts may have to resolve subsidiary factual disputes" that are part and parcel of the broader legal question. *Teva Pharmaceuticals USA, Inc.* v. *Sandoz, Inc.*, 574 U. S. \_\_\_, \_\_\_–\_\_\_ (2015) (slip op., at 6–7). And, as in contexts as diverse as the proper construction of patent claims and the voluntariness of criminal confessions, they create a question that "'falls somewhere between a pristine legal standard and a simple historical fact.'" *Markman,* 517 U. S., at 388 (quoting *Miller* v. *Fenton*, 474 U. S. 104, 114 (1985)). In those circumstances, "'the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question.'" *Markman*, 517 U. S., at 388 (quoting *Miller*, 474 U. S., at 114). In this context, that "better positioned" decisionmaker is the judge.

IV

Because the Court of Appeals treated the pre-emption question as one of fact, not law, and because it did not have an opportunity to consider fully the standards we have described in Part II of our opinion, we vacate its judgment and remand the case to that court for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–290

_____

## MERCK SHARP & DOHME CORP., PETITIONER *v.* DORIS ALBRECHT, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[May 20, 2019]

JUSTICE THOMAS, concurring.

I join the Court's opinion and write separately to explain my understanding of the relevant pre-emption principles and how they apply to this case.

The Supremacy Clause of the Constitution provides:

> "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Art. VI, cl. 2.

Under this Clause, "[w]here state and federal law 'directly conflict,' state law must give way." *PLIVA, Inc.* v. *Mensing*, 564 U. S. 604, 617 (2011). Although the Court has articulated several theories of pre-emption, Merck's sole argument here is that state law is pre-empted because it is impossible for Merck to comply with federal and state law. I remain skeptical that "physical impossibility" is a proper test for deciding whether a direct conflict exists between federal and state law. But even under our impossibility precedents, Merck's pre-emption defense fails.

## I

As I have explained before, it is not obvious that the "'physical impossibility' standard is the best proxy for determining when state and federal laws 'directly conflict' for purposes of the Supremacy Clause." *Wyeth* v. *Levine*, 555 U. S. 555, 590 (2009) (opinion concurring in judgment). Evidence from the founding suggests that, under the original meaning of the Supremacy Clause, federal law pre-empts state law only if the two are in logical contradiction. See *ibid.*; Nelson, Preemption, 86 Va. L. Rev. 225, 260–261 (2000). Sometimes, federal law will logically contradict state law even if it is possible for a person to comply with both. For instance, "if federal law gives an individual the right to engage in certain behavior that state law prohibits, the laws would give contradictory commands notwithstanding the fact that an individual could comply with both by electing to refrain from the covered behavior." *Wyeth*, 555 U. S*.,* at 590 (opinion of THOMAS, J.).

Merck does not advance this logical-contradiction standard, and it is doubtful that a pre-emption defense along these lines would succeed here. "To say, as the statute does, that [Merck] may not market a drug without federal approval (*i.e.*, without [a Food and Drug Administration (FDA)] approved label) is not to say that federal approval gives [Merck] the unfettered right, for all time, to market its drug with the specific label that was federally approved." *Id.*, at 592. Nothing in the federal brand-name-drug "statutory or regulatory scheme necessarily insulates [Merck] from liability under state law simply because the FDA has approved a particular label." *Id.,* at 593. The relevant question would be whether federal law gives Merck "an unconditional right to market [a] federally approved drug at all times with the precise label initially approved by the FDA," *id.,* at 592, or whether it instead provides a federal floor that can be supplemented by dif-

ferent state standards, see Brief for Cato Institute as *Amicus Curiae* 14, n. 4. Absent a federal statutory right to sell a brand-name drug with an FDA-approved label, FDA approval "does not represent a finding that the drug, as labeled, can never be deemed unsafe by later federal action, or as in this case, the application of state law." *Wyeth, supra,* at 592 (opinion of THOMAS, J.).

## II

Applying the Court's impossibility precedents leads to the same conclusion. The question for impossibility is whether it was "lawful under federal law for [Merck] to do what state law required of" it. *Mensing,* 564 U. S., at 618. Because "[p]re-emption analysis requires us to compare federal and state law," I "begin by identifying the [relevant] state tort duties and federal labeling requirements." *Id.,* at 611. Respondents' claim here is "that state law obligated Merck to add a warning about atypical femur fractures" to the Warnings and Precautions section of Fosamax's label. *In re Fosamax (Alendronate Sodium) Prods. Liability Litig.,* 852 F. 3d 268, 282 (CA3 2017). Under the Federal Food, Drug, and Cosmetic Act, a manufacturer of a brand-name drug "bears responsibility for the content of its label at all times." *Wyeth,* 555 U. S., at 570–571 (majority opinion). The manufacturer "is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market." *Id.,* at 571. Generally, to propose labeling changes, the manufacturer can submit a Prior Approval Supplement (PAS) application, which requires FDA approval before the changes are made. 21 CFR §314.70(b) (2018). Alternatively, under the FDA's Changes Being Effected (CBE) regulation, if the manufacturer would like to change a label to "add or strengthen a contraindication, warning, precaution, or adverse reaction" "to reflect newly acquired information," it can change the label immediately

upon filing its supplemental application with the FDA, without waiting for FDA approval. §314.70(c)(6)(iii); see *Wyeth*, *supra*, at 568. If the FDA later disapproves the CBE application, "it may order the manufacturer to cease distribution of the drug product(s)" with the new labeling. §314.70(c)(7).

Here, Merck's impossibility pre-emption defense fails because it does not identify any federal law that "prohibited [it] from adding any and all warnings . . . that would satisfy state law." *Ante,* at 13. By its reference to "the Laws of the United States," the Supremacy Clause "requires that pre-emptive effect be given only to those federal standards and policies that are set forth in, or necessarily follow from, the statutory text that was produced through the constitutionally required bicameral and presentment procedures." *Wyeth*, *supra*, at 586 (opinion of THOMAS, J.). Merck's primary argument, based on various agency communications, is that the FDA would have rejected a hypothetical labeling change submitted via the CBE process. But neither agency musings nor hypothetical future rejections constitute pre-emptive "Laws" under the Supremacy Clause.

As the Court describes, in 2008 Merck submitted PAS applications to add certain language regarding fractures to the Adverse Reactions and the Warnings and Precautions sections of Fosamax's label. *Ante*, at 6. In 2009, the FDA sent Merck a "complete response" letter "agree[ing] that atypical and subtrochanteric fractures should be added" to the Adverse Reactions section. App. 510–511. But the letter said that Merck's proposed Warnings and Precautions language, which focused on "the risk factors for stress fractures," was "inadequate" because "[i]dentification of 'stress fractures' may not be clearly related to the atypical subtrochanteric fractures that have been reported in the literature." *Id.*, at 511. In accord with FDA regulations, the letter required Merck to take one of three actions: (1)

"[r]esubmit the application . . . , addressing all deficiencies identified in the complete response letter"; (2) "[w]ithdraw the application . . . without prejudice to a subsequent submission"; or (3) "[a]sk the agency to provide . . . an opportunity for a hearing," after which "the agency will either approve" or "refuse to approve the application." 21 CFR §314.110(b); see App. 512. As this regulation suggests and the FDA has explained, complete response letters merely "infor[m] sponsors of changes that must be made before an application can be approved, *with no implication as to the ultimate approvability of the application*." 73 Fed. Reg. 39588 (2008) (emphasis added). In other words, the 2009 letter neither marked "the consummation of the agency's decisionmaking process" nor determined Merck's "rights or obligations." *Bennett* v. *Spear*, 520 U. S. 154, 178 (1997) (internal quotation marks omitted). Instead, it was "of a merely tentative or interlocutory nature." *Ibid.* Therefore, the letter was not a final agency action with the force of law, so it cannot be "Law" with pre-emptive effect.

Merck's argument that the 2009 letter and other agency communications suggest that the FDA would have denied a future labeling change fares no better: hypothetical agency action is not "Law." As Merck acknowledges, it could have resubmitted its PAS applications, sought a hearing, or changed its label at any time through the CBE process. See Reply Brief 13. Indeed, when Merck instead decided to withdraw its PAS applications, it added atypical femoral fractures to the Adverse Reactions section through the CBE process. That process also enabled Merck to add language to the Warnings and Precautions section, but Merck did not do so. If it had, it could have satisfied its federal and alleged state-law duties—meaning that it was possible for Merck to independently satisfy both sets of duties. Merck's belief that the FDA would have eventually rejected a CBE application does not make

an earlier CBE change impossible. As the Court correctly explains, "'the possibility of impossibility [is] not enough.'" *Ante,* at 13–14. The very point of the CBE process is that a manufacturer can "unilaterally" make a labeling change that does not violate other federal law, *Wyeth*, 555 U. S., at 573; see *id.,* at 570; *e.g.,* 21 U. S. C. §352, at least until the FDA rules on its application.*

Because Merck points to no statute, regulation, or other agency action with the force of law that would have prohibited it from complying with its alleged state-law duties, its pre-emption defense should fail as a matter of law.

————————

*In 2007, Congress "granted the FDA statutory authority to require a manufacturer to change its drug label based on safety information that becomes available after a drug's initial approval," but even after this amendment, brand-name-drug "manufacturers remain responsible for updating their labels." *Wyeth*, 555 U. S., at 567–568; see 21 U. S. C. §355(*o*)(4). As I understand the Court's opinion, if proper agency actions pursuant to this amendment, or other federal law, "prohibited the drug manufacturer from . . . satisfy[ing] state law," state law would be pre-empted under our impossibility precedents regardless of whether the manufacturer "show[ed] that it fully informed the FDA of the justifications for the warning required by state law." *Ante,* at 13; see, *e.g., Wyeth*, 555 U. S*.,* at 576; *id.,* at 582 (BREYER, J., concurring). Of course, the only proper agency actions are those "that are set forth in, or necessarily follow from, the statutory text," and they must have the force of law to be pre-emptive. *Id.,* at 586 (opinion of THOMAS, J.). I am aware of no such agency action here that prevented Merck from complying with state law.

# SUPREME COURT OF THE UNITED STATES

No. 17–290

MERCK SHARP & DOHME CORP., PETITIONER *v.*
DORIS ALBRECHT, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[May 20, 2019]

JUSTICE ALITO, with whom THE CHIEF JUSTICE and
JUSTICE KAVANAUGH join, concurring in the judgment.

I concur in the judgment because I agree with the
Court's decision on the only question that it actually de-
cides, namely, that whether federal law allowed Merck to
include in the Fosamax label the warning alleged to be
required by state law is a question of law to be decided by
the courts, not a question of fact. I do not, however, join
the opinion of the Court because I am concerned that its
discussion of the law and the facts may be misleading on
remand.

I

I begin with the law. The Court correctly notes that a
drug manufacturer may prove impossibility pre-emption
by showing that "federal law (including appropriate [Food
and Drug Administration (FDA)] actions) prohibited the
drug manufacturer from adding any and all warnings to
the drug label that would satisfy state law." *Ante,* at 13.
But in expounding further on the pre-emption analysis,
the Court provides a skewed summary. While dwelling on
our decision in *Wyeth* v. *Levine*, 555 U. S. 555 (2009), see
*ante,* at 9–14, the Court barely notes a statutory provision
enacted after the underlying events in that case that may
have an important bearing on the ultimate pre-emption

analysis in this case.

Under 21 U. S. C. §355(*o*)(4)(A), which was enacted in 2007, Congress has imposed on the FDA a duty to initiate a label change "[i]f the Secretary becomes aware of new information, including any new safety information . . . that the Secretary determines should be included in the labeling of the drug."* This provision does not relieve drug manufacturers of their own responsibility to maintain their drug labels, see §355(*o*)(4)(I), but the FDA's "actions," *ante,* at 13, taken pursuant to this duty arguably affect the pre-emption analysis. This is so because, if the FDA declines to require a label change despite having received and considered information regarding a new risk, the logical conclusion is that the FDA determined that a label change was unjustified. See *United States* v. *Chemical Foundation, Inc.*, 272 U. S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties"). The FDA's duty does not depend on whether the relevant drug manufacturer, as opposed to some other entity or individual, brought the new information to the FDA's attention. Cf. *ante,* at 13 ("the drug manufacturer [must] show that it fully informed the FDA of the justifications for the warning required by state law"). Nor does §355(*o*)(4)(A) require the FDA to communicate to the relevant drug manufacturer that a label change is unwarranted; instead, the FDA could simply consider the new information and decide not to act. Cf. *ante,* at 13 ("[T]he FDA, in turn, [must have] informed the drug manufacturer that the FDA would not approve

——————

*Prior to October 2018, §355(*o*)(4)(A)'s language contained slight differences not relevant here. See Substance Use–Disorder Prevention That Promotes Opioid Recovery and Treatment for Patients and Communities Act, Pub. L. 115–271, §3041(b), 132 Stat. 3942–3943, effective Oct. 24, 2018.

changing the drug's label to include that warning").

Section 355(*o*)(4)(A) is thus highly relevant to the pre-emption analysis, which turns on whether "federal law (*including appropriate FDA actions*) prohibited the drug manufacturer from adding any and all warnings to the drug label that would satisfy state law." *Ante,* at 13 (emphasis added). On remand, I assume that the Court of Appeals will consider the effect of §355(*o*)(4)(A) on the pre-emption issue in this case.

Two other aspects of the Court's discussion of the legal background must also be mentioned. First, although the Court's discussion of the point is a bit opaque, the Court holds—correctly, in my view—that *Wyeth*'s use of the phrase "clear evidence" was merely a rhetorical flourish. As the Court explains, a judge, in determining whether federal law would permit a label change allegedly required by state law, "must simply ask himself or herself whether the relevant federal and state laws 'irreconcilably con-flic[t].'" *Ante,* at 14 (quoting *Rice* v. *Norman Williams Co.*, 458 U. S. 654, 659 (1982)). Standards of proof, such as preponderance of the evidence and clear and convincing evidence, have no place in the resolution of this question of law.

Second, for reasons that entirely escape me, the Court refuses to acknowledge that there are two ways in which a drug manufacturer may attempt to alter a drug's label. The Court notes that a manufacturer may proceed under the FDA's "'changes being effected'" or "'CBE'" regulation, which permits a manufacturer to change a label without prior FDA approval under some circumstances. See *ante,* at 3–4, 14. But the Court refuses to note that a manufac-turer may (and, in many circumstances, must) submit a Prior Approval Supplement (PAS). 21 CFR §314.70(b) (2018). As the name suggests, changes proposed in a PAS must receive FDA approval before drug manufac-turers may make the changes. §314.70(b)(3). And

"[h]istorically," the FDA has "accepted PAS applications instead of CBE supplements, as occurred in this case, particularly where significant questions exist on whether to revise or how to modify existing drug labeling." Brief for United States as *Amicus Curiae* 5.

## II

I now turn to the facts. Resolution of the legal question that the Court decides does not require much discussion of the facts, but if the Court wishes to include such a summary, its presentation should be balanced. Instead, the Court provides a one-sided account. For example, it highlights historical accounts dating back to the 1990s that purportedly linked atypical femoral fractures with Fosamax use, see *ante,* at 5, 7, but it omits any mention of the extensive communication between Merck and the FDA during the relevant period.

A reader of the Court's opinion will inevitably be left with the impression that, once the FDA rejected Merck's proposed warning in 2009, neither the FDA nor Merck took any other actions related to atypical femoral fractures "until 2011," *ante,* at 6. But that is simply not true.

While Merck's 2008 proposal was pending, the FDA remained in contact with Merck about the issue of atypical femoral fractures, which Merck, at the time, labeled as a type of stress fracture. See, *e.g.,* App. 707, 746–748. An internal Merck memorandum describes a phone call in which an FDA official allegedly told Merck that "[t]he conflicting nature of the literature does not provide a clear path forward, and more time will be need[ed] for FDA to formulate a formal opinion on the issue of a precaution around these data." *Id.,* at 767. In an e-mail about a week later, another FDA official told Merck that the FDA would "close out" Merck's applications if Merck "agree[d] to hold off on the [Precautions] language at this time." *Id.,* at 508. The official went on to say that the FDA "would then work

with . . . Merck to decide on language for a [Precautions] atypical fracture language, if it is warranted." *Ibid.*

Then, months after the FDA rejected Merck's proposed warning, the FDA issued a Safety Announcement regarding its "[o]ngoing safety review of oral bisphosphonates and atypical subtrochanteric femur fractures." *Id.,* at 519. The Safety Announcement stated that, "[a]t this point, the data that FDA has reviewed have not shown a clear connection between bisphosphonate use and a risk of atypical subtrochanteric femur fractures." *Ibid.* Nonetheless, the Safety Announcement announced the FDA's intent to further study the issue alongside a task force formed to address the atypical fractures. *Id.,* at 519–520. And the Safety Announcement concluded by admonishing healthcare professionals to "continue to follow the recommendations in the drug label when prescribing oral bisphosphonates" and patients to "not stop taking their medication unless told to do so by their healthcare professional." *Id.,* at 520–521.

In September 2010, the task force published its report, which concluded that, although there was no established "causal association" between bisphosphonates and atypical femoral fractures, "recent observations suggest that the risk rises with increasing duration of exposure, and there is concern that lack of awareness and underreporting may mask the true incidence of the problem." *Id.,* at 284. The same day, the FDA issued a statement acknowledging the task force report and committing to "considering label revisions." *Id.,* at 523–525. And in October 2010, the FDA issued another Safety Announcement in which the FDA stated that it would initiate changes in the Precautions section of bisphosphonate drug labels to warn of atypical femoral fractures. *Id.,* at 246–249. It was not until then that, pursuant to its §355(*o*)(4)(A) obligations, the FDA instructed Merck to include a warning about such fractures in its Fosamax drug labels. *Id.,* at 526–534.

Thus, for years the FDA was: aware of this issue, communicating with drug manufacturers, studying all relevant information, and instructing healthcare professionals and patients alike to continue to use Fosamax as directed. For this reason, the FDA itself, speaking through the Solicitor General, takes the position that the FDA's decision not to require a label change prior to October 2010 reflected the FDA's "determin[ation]" that a new warning "should [not] be included in the labeling of the drug," §355(*o*)(4)(A).    See Brief for United States as *Amicus Curiae* 30, 33–34.

For these reasons, I concur in the judgment only.